FORTUNAT J. MICHAUD
*vs.*
STATE OF MAINE, ET AL.

York.   Opinion, December 13, 1965.

*Charles W. Smith,* for Petitioner.

*John W. Benoit, Asst. Atty. General,* for Defendants.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, MARDEN, RUDMAN, JJ. SULLIVAN, J., sat at argument but retired before the opinion was adopted.

WEBBER, J. This was a petition for the writ of habeas corpus brought pursuant to 14 M.R.S.A. Sec. 5502 (formerly R. S., 1954, Chap. 126, Sec. 1-A). The petitioner is serving a life sentence for the crime of murder. The writ was issued and the matter fully heard by the justice below, the petitioner being represented by court appointed counsel. Many allegations of the petition were disposed of before issuance of the writ in a manner not challenged by either party. The only issues remaining for determination at the time of hearing were raised by Counts V and IX and may be briefly summarized as follows:

> 1. Whether or not the conviction of the petitioner for murder resulted in part from the State's use of a

"confession" obtained from the petitioner in violation of his constitutional rights.

2. Whether or not the petitioner at his original trial, being then indigent, was afforded adequate representation by competent counsel.

The justice below resolved the first issue in favor of the petitioner and therefore deemed it unnecessary to determine the second issue. A new trial was ordered and the State has appealed.

We turn at once to the first and decisive issue. Since our decision must rest squarely on the peculiar facts of this case, some recitation thereof is essential at the outset.

Fortunat J. Michaud was in 1955, the time of this tragic event, a boy 15 years of age. He was unable to read or write and possessed the mental capacity of a normal 12 year old. He had resided with foster parents for all but the first two years of his life. In September, 1964 when hearing was held on the matter now before us, he was 24 years old and had served 9 years in prison. The victim of this homicide was one Doris Trudeau, a child of 11 years. On the day in question Doris failed to return home at the usual hour and in due course the police were alerted to her disappearance. They obtained a slender lead suggesting that Doris had been seen during the day in company with a boy answering the description of Michaud. About 9 o'clock in the evening an officer called at his home and asked him if he had seen Doris that day. Michaud disclosed the fact that he had been with the girl in the forenoon before they returned to their respective homes for lunch, but he related none of the events of the afternoon leading up to and culminating in the fatal assault. Captain Tardiff, the investigating officer, then sought and obtained the permission of the foster mother to take Michaud to the police station for further questioning. It is important to know that at this point

the police *had no knowledge* of Doris' whereabouts or that any crime had been committed. Questioning by two officers continued for about three hours. The justice below found on the basis of credible evidence that the petitioner at no time requested counsel and was not during those evening hours advised of any right to counsel or that any statement made by him could be used against him; that he was not during this period of interrogation "held incommunicado" as alleged although he was not visited by friends or relatives; and that he was not abused physically or mentally or subjected to any force. It appears that during the greater part of the evening Michaud continued to deny any knowledge of the whereabouts of Doris. Neither the transcript of the testimony at the original trial, made available as a part of this record, nor the evidence adduced at the habeas corpus hearing serve to make it clear as to just when or why the interrogating officers began to entertain a lively suspicion that Doris might be the victim of some sort of foul play of which Michaud possessed as yet undisclosed knowledge. In any event there came a time when these suspicions were heightened by certain of Michaud's responses to questions. Officer McAlevy, one of the interrogators, described that moment as follows:

> "This particular case, during the course of the interrogation he kept making the statement of that he went over the tracks and she turned around and went back home. Well, we asked him this question several times. Now the last time that he said it he made the statement of that, he stated, 'We started up — ', and he stopped. He had used the plural. He says, 'We started up.' Which in that particular area at that time, the only place he could have been started up would have been a set of railroad tracks. * * * As I was going to say, as we went on to interrogate him I more or less asked him a leading question and said, asked him, said, 'She's still up there, isn't she?' And he shook his head as if to say, 'Yes,'

she was still up there. So, I mean, as far as anything that's concerned, we've already established that — that the body was in that area. We didn't pinpoint it down as to exactly where it was. But we knew it was up off the railroad tracks."

We can only attribute to the training and instincts of the experienced police officer the fact that with what proved later to be perfect accuracy the official mind apparently jumped instantly to the conclusion, first, that the girl Doris was dead and, second, that her body would be found in the area "up off the railroad tracks." The record is silent as to the subsequent course of the interrogation. We are informed only that there came a time when a conversation took place which forms the basis of the decision before us for review. The justice below accepted the testimony of Officer McAlevy as accurately and truthfully recapitulating this conversation. At the habeas corpus hearing he was asked the following question and gave the following answer:

"Q. To your knowledge then, the best of your knowledge — being some 9 years ago, you didn't give him or take part in drafting any written promise.

A. However, in all fairness to Mr. Michaud, I would like to state this: That during the course of the investigation that I did—he—he—well, he said to me in so many words, he said, 'What will happen to me?' Something to that effect. And I says, 'I don't really know. I know that you are a minor.' I says 'I don't know if they'll send you to State School for boys, or where they'll send you. It'll be up to the courts to decide.' And that's the only thing that I can — ."

And later on cross examination he added:

"Well, he asked me and I told that, yes, I agree with that, that — he asked me, 'What will hap-

pen to me?' And then that's the way I asked him. I says, 'I know that you're a minor, and I realize that you're sorry for what you done.' Etc., etc. And I says, 'I don't know exactly where you'll go, whether you'll go to State School for Boys, or, exactly where you go.' I said this verbally to him. Nothing was written down."

The witness was not asked and we are not otherwise informed as to what occurred thereafter or how long the questioning continued after the quoted conversation took place. We know only that the interrogation ceased about midnight and the officers and a physician were led by Michaud to a place in the woods where the dead body of Doris Trudeau was found. There is no evidence that any formal accusation or charge had been lodged against Michaud at least until after the body had been found and examined.

Upon return to the police station at about 4 A.M. Michaud was questioned by an officer of the Maine State Police. They were alone. The officer asked him if he had been arrested and he replied that he didn't know but guessed so. Michaud, after being informed as to the identity and purpose of his interrogator and after being warned that what he said could be used against him, was invited to "tell the truth and nothing but the truth." Michaud then related the events of the day and this narration was subsequently incorporated in a written confession. We note in passing that the preliminary oral confession, although excluded from evidence in the early stages of the trial until the mental capacity of the then respondent to make a voluntary confession had been shown, was thereafter admitted without objection. In due course counsel was appointed to represent Michaud and the latter was then committed to the Augusta State Hospital for observation and examination with respect to mental illness. Michaud again narrated the details of his criminal conduct, this time to the as-

sembled staff. Although this version was substantially the same as those previously given, it varied in some respects and Michaud admitted that he had not been truthful on prior occasions as to these details. This narration was given without objection in fullest detail to the jury under the questioning of both the State and the then respondent.

We come now to the specific allegations and the proof tendered in support thereof at the hearing below in the instant case. The justice below accurately summarized the allegations of Count V of the petition as follows:

"That the petitioner was taken to the Saco jail and held incommunicado against his wishes, surrounded by police officials and was not afforded the opportunity of counsel or made aware of his rights to counsel. That he was promised if he would make a confession, the police officials would see that he was given a sentence in the State School for Boys and that said promise was reduced to writing and given to the petitioner, whereupon a confession was given by him. That the petitioner retained the promise until just prior to his arraignment in Municipal Court when he gave the promise to police officials upon request and with the promise that they would show the promise to the Judge and intercede in his behalf to secure a sentence to the State School for Boys. That the State at the time of trial had or should have had the written promise and should have produced it for the Court's consideration in ruling upon the preliminary question of admissibility of any purported confession. That petitioner's counsel was informed of the existence of the written promise. That the written promise was not shown to the Court at the time of trial."

In an effort to prove these contentions, the petitioner testified in substance that when he was being interrogated between 9 P.M. and midnight on August 24, 1955 he told the two officers (Captain Tardiff and Officer McAlevy) that

he had not harmed or killed Doris Trudeau; that he persisted in this denial until he finally said to them, "You promise to talk to the judge, and get me sent to the State's *(sic)* School or something like that, and I'll tell you where she is;" that McAlevy then wrote "it" down and both officers signed "it" and gave "it" to him; that although he could not read "it," the officers did not then know he couldn't read; that he put what he believed to be their written promise in his shirt pocket; that thereafter he took the officers to the location of the body; that at the municipal court on the next morning the "high sheriff" engaged him in the following conversation:

"Q. The officers promise you something?
A. Yes.

Q. You got a piece of paper?
A. Yes.

Q. Well, why don't you give it to me. I'll give it to the judge for you;"

that thereupon he passed the paper over to him; and that at some time during his subsequent jury trial he told the attorney then acting as his trial counsel that such a promise had been given but no subsequent use was made of it. On cross-examination the petitioner admitted that on the first two occasions when he talked with his counsel he "forgot" the promise. He described the paper as white, written upon in pencil, about 4 inches wide and 5 inches long and containing 4 or 5 written lines. It is apparent that the petitioner's testimony, wholly uncorroborated and flatly contradicted by the State's witnesses, was deemed unworthy of belief by the justice below. The decree states: "I am not satisfied that *any direct promise* was made by any officer that if he would confess, the officer would see that he was given a sentence in the State School for Boys, or that such a promise was given to him in writing and afterwards turned over to the Sheriff." (Emphasis supplied.) This

finding, fully justified and supported by the evidence, completely negatives the contention of the petitioner that the government improperly suppressed evidence during trial, knowing that evidence to be favorable and important to the petitioner on the preliminary issue of the voluntariness of any confession.

We think this finding effectively disposed of Count V. Although some liberality is afforded as to the draftsmanship of petitions for post conviction relief, we see no reason why, when counsel has been appointed, the petition amended and reamended, and the issues fixed and limited by the pleadings and pre-trial process, the State should be required at this post conviction stage to meet issues not thus tendered. If the amended allegations of the petition which clearly state a specific constitutional deprivation are not supported by credible evidence, the State should prevail. So in this case the petitioner alleged a *written promise suppressed by the State.* He proved neither an oral or written promise and no such suppression.

At the hearing below as already noted, however; the State offered as a witness Officer McAlevy who, after denying the giving of any written promise, quite unresponsively but with refreshing candor volunteered the information relating to his reference to the State School for Boys quoted above. The justice below found in this testimony a basis for holding that petitioner's conviction must be set aside. After reviewing certain undisputed facts already covered earlier in this opinion he continued as follows:

> "However, something was said at the interrogation in regard to the State School for Boys. I quote from the testimony of one of the officers taking part in the interrogation as follows: (here follows the McAlevy statement above quoted). The petitioner testified that during the course of the trial he told his counsel of the promise. I am not satisfied that he did this, or that he realized

the importance of disclosing the information. In any event, the matter was not brought to the attention of the presiding justice by testimony or otherwise. * * * In view of the questioning by his interrogators, the act of the petitioner was in effect a verbal confession of the crime of murder. It affected the whole course of the trial. Taking into consideration the petitioner's age and mental capacity, the statement of the officer, who had been interrogating, undoubtedly raised in the petitioner's mind the hope that a sentence to the Boys' School might be imposed, and constituted an inducement to disclose the location of the body to the officers. Furthermore, fair play would seem to require the officers to make known to a person of petitioner's mental capacity the fact that he could ask for counsel, and that anything he said would be used against him; also that he was not required to talk. If, at the time of the trial, the presiding justice had known of the facts testified to by the officer at the hearing on this petition, the whole course of the proceedings would have been changed. Due inquiry undoubtedly would have been made into the circumstances surrounding the examination of the petitioner which resulted in his showing the location of the body. I find that the constitutional right of the respondent to due process has been violated and that he should be given an opportunity to have a new trial."

The State contends that the act of leading the officers to the woods, pointing out articles of clothing, a bicycle and the like belonging to the deceased, and later taking them to the location of the body was an "admission" rather than a "confession." It is urged that such an act, unaccompanied by any admission of guilt, is admissible without regard to voluntariness. The authorities are by no means in harmony on this point. We have discovered no cases in Maine and none have been called to our attention which directly meet and control the issue. In *State* v. *Gilman* (1862), 51 Me. 206, the accused was called by a coroner

and gave sworn testimony at an inquest. This testimony was reduced to a written statement which he signed. The statement was later offered in evidence at the trial of the accused for murder. It contained no confession but rather comprised a complete denial of any knowledge or participation in the death of the deceased. Nevertheless the court applied the test of voluntariness and satisfied itself that the statement was not obtained by compulsion or inducement. In *State* v. *Priest* (1918), 117 Me. 223, 230, 103 A. 359, the court seemed to imply that "mere admissions" were not subject to the test of voluntariness. In this case the statement was in the nature of an exculpatory explanation of certain conduct which neither directly nor indirectly pointed toward the guilt of the narrator. In *State* v. *O'Donnell* (1932), 131 Me. 294, 301, 161 A. 802, the court said: "The government does not rely, in his instance, on a confession, but on his admission of independent facts, from which, when considered with other facts, it is insisted, his guilt was inferable. A confession is the voluntary acknowledgment of the criminal act charged, or of participation in its commission. Incriminating admissions may be made without any intention of confession." This opinion, while distinguishing confessions from admissions, falls far short of teaching us whether or not admissions as thus defined should be admitted even though coerced or induced.

Wigmore on Evidence, 3d Ed., Vol. III, Sec. 822, Page 246 states the basis of exclusion of a confession obtained by promise or threat. "The principle upon which a confession is treated as sometimes inadmissible is that *under certain conditions it becomes untrustworthy as testimony.*" Sec. 821, Page 238 defines a confession as *"an acknowledgment in express words,* by the accused in a criminal case, *of the truth of the guilty fact charged or of some essential part of it."* Wigmore asserts that "exculpatory statements" and "acknowledgments of subordinate facts colorless with ref-

erence to actual guilt" do not logically fall within the reasons for exclusion. It is plain, however, that there is a split of authority as to whether admissions of facts short of guilt are subject to the same rules as to voluntariness, at least where such facts are inculpatory or tend to show criminal intent.

The Massachusetts Court, distinguishing confessions from admissions, held that the rule excluding a confession of guilt by the defendant which he was induced to make through hope of benefit or because of fear has no application to a statement which is no more than an admission of subordinate facts. *Commonwealth* v. *Gleason* (1928), 262 Mass. 185, 159 N.E. 518, 520; *Commonwealth* v. *Dascalakis* (1923), 137 N.E. (Mass.) 879. And the trial court need not hold a preliminary hearing to test the voluntariness of a mere admission, even though so requested. *Commonwealth* v. *Haywood* (1923), 247 Mass. 16, 141 N.E. 571. But compare *Commonwealth* v. *Wallace* (1963), 190 N.E. (2nd) (Mass.) 224, 229. Reaching like results *State* v. *Spencer* (1953), 258 P. (2nd) (Idaho) 1147, 1152; *State* v. *McGee* (1962), 91 Ariz. 101 370 P. (2nd) 261; *State* v. *Robinson* (1961), 89 Ariz. 224, 360 P. (2nd) 474, 477; *Watts* v. *State* (1950), 95 N.E. (2nd) (Ind.) 570, 583; *State·* v. *George* (1945), 43 A. (2nd) (N.H.) 256, 262; *Cram* v. *United States* (1963), 10 Cir., 316 F. (2nd) 542, 544; see *State* v. *Callaghan* (1963), 81 N.J. Super. 518, 196 A. (2nd) 245.

Other courts, however, have under varying circumstances applied the test of voluntariness to admissions. In *Bram* v. *United States* (1897), 168 U.S. 532, 42 L.ed. 568, the accused made a statement exculpatory in nature and in no sense an admission of guilt. The court applied the test of voluntariness. In *Opper* v. *United States* (1954), 348 U.S. 84, 75 S. Ct. 158, dealing with the requirement of corrobation, the court treated the accused's admissions of es-

sential facts or elements of the crime as of the same character as confessions. In *Ashcraft* v. *State of Tennessee* (1946), 327 U.S. 274, 66 S. Ct. 544, accused under coercion admitted knowledge that murder had been committed and by whom without however admitting any guilty participation. The court, characterizing the statement as very damaging and carrying "the strongest implications of a guilty knowledge" applied the test applicable to confessions.

We find the subject excellently summarized by Mr. Justice Traynor in *People* v. *Atchley* (1959), 346 P. (2nd) (Cal.) 764, 768, 769:

> "There has been considerable confusion as to the admissibility in a criminal proceeding of statements allegedly made by the defendant involuntarily. * * * Many opinions distinguish 'confessions' and 'admissions' and state that the latter are admissible without regard to their involuntary character. * * * The distinctions between confessions and admissions, however, are 'subtle and questionable.' * * * We have required preliminary proof of the voluntary character of statements that include 'an important incriminating fact.' * * *
>
> "Involuntary confessions are excluded because they are untrustworthy, because it offends 'the community's sense of fair play and decency' to convict a defendant by evidence extorted from him, and because exclusion serves to discourage the use of physical brutality and other undue pressures in questioning those suspected of crime. * * * All these reasons for excluding involuntary confessions apply to involuntary admissions as well. * * * Accordingly, any statement by an accused relative to the offense charged is inadmissible against him if made involuntarily."

Followed in *People* v. *Fitzgerald* (1961), 366 P. (2nd) (Cal.) 481.

The Maryland Court, noting the split of authority, held that an admission which is "significantly incriminating" but short of a confession of guilt must nevertheless be voluntary and not improperly induced. The court reasoned that where an admission is "in substance a partial confession" or "in the nature of a confession" there is the "same potential danger of coercion." *Stewart* v. *State* (1963), 232 Md. 318, 193 A. (2nd) 40, 43.

On balance we are disposed to think that the reasoning of the California and Maryland opinions is persuasive and better accords with the modern trend of the law with respect to the constitutional rights of individuals. We are not satisfied that we can rest decision in the instant case on the ground urged by the State that we are dealing with "mere admissions." We can hardly overlook the fact that the act of taking the officers to the woods where they obtained their first objective and tangible evidence that a crime had been committed was under all the existing circumstances "significantly incriminating." We believe that the decision in this case more properly rests on other grounds.

We turn then to an examination of all of the circumstances and apply the test of voluntariness as though to a confession. We take particular note of the following cases which serve to demonstrate the development of the applicable law in the past twenty years: *Ashcraft* v. *State of Tennessee, supra; Haley* v. *State of Ohio* (1948), 332 U.S. 596, 68 S. Ct. 302; *Crooker* v. *State of California* (1958), 357 U.S. 433, 78 S. Ct. 1287; *Cicenia* v. *La Gay* (1958), 357 U.S. 504, 78 S. Ct. 1297; *Spano* v. *People of the State of New York* (1959), 360 U.S. 315, 79 S. Ct. 1202; *Culombe* v. *Connecticut* (1961), 367 U.S. 568, 81 S. Ct. 1860; *Gallegos* v. *State of Colorado* (1962), 370 U.S. 49, 82 S. Ct. 1209; *Haynes* v. *State of Washington* (1963), 373 U.S. 503, 83 S. Ct. 1336; *Lynumn* v. *State of Illinois* (1963), 372 U.S.

528, 83 S. Ct. 917; and *Escobedo* v. *State of Illinois* (1964), 378 U.S. 478, 84 S. Ct. 1758.

We learn from these cases that the United States Supreme Court, in ascertaining whether or not a conviction in a state court has resulted in part from the use of a confession improperly obtained from an accused person, will examine the "totality of circumstances" in the particular case. The sum total of operating "factors" may or may not in a given case reach the "coercive intensity" which precludes the use of the incriminating statement. Among the "factors" which have been considered are the age and mental capacity of the accused, the duration and method of interrogation, the absence or denial of access to parents, friends or attorney, failure to take the accused promptly before a magistrate, failure to warn and advise the accused of his right to request counsel and remain silent, and the use of force, threat or promise. On the other hand the necessity for proper investigation and interrogation by the police is fully recognized. In *Escobedo,* the most recent of the cases cited above, the court said at page 1766 of 84 S. Ct.: "Nothing we have said today affects the powers of the police to investigate 'an unsolved crime' * * * by gathering information from witnesses and by other 'proper investigative efforts.' * * * We hold only that *when the process shifts from investigatory to accusatory* — when its focus is on the accused and its purpose is to elicit a confession — our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." (Emphasis ours.) In short, with respect to voluntariness the test is always whether or not there has been under *all* the circumstances a violation of "fundamental fairness" or what we ourselves have sometimes termed "governmental fair play." With respect to the right to counsel and to remain silent specifically relied upon in *Escobedo,* we look first to discover whether the

process is beyond the investigatory stage. *Commonwealth v. Lapore* (1965), 207 N.E. (2nd) (Mass.) 26.

Although we accept the findings of fact of the justice below, we are not bound by his conclusion of law that the sum total of these factual circumstances constituted such a deprivation of the constitutional rights of this petitioner as to compel the setting aside of his conviction.

On the one hand we recognize the youth, the illiteracy and mental retardation of the petitioner in 1955. We note that he was interrogated for about three hours during which time he was not in fact visited by friends or relatives; that during that time he was not advised by anyone of a right to have counsel or that any statement he might make could be used against him. We do not overlook the fact that a reference was made by the investigating officer to the State School for Boys at some time prior to the petitioner's offer to show the officers where Doris was. On the other hand we deem it important that *the police had no knowledge that a crime had been committed.* They knew only that Doris Trudeau who had last been seen in the company of the petitioner had not returned home at the usual time and had been missing for several hours. Their first objective was to find out if possible where Doris was. Until they knew positively that a crime had been committed, they could accuse the petitioner of nothing. This investigation had not even progressed to the "unsolved crime" stage referred to above in *Escobedo.* Trial balloon and random shot questions based on mere suspicion that there *may* have been some sort of foul play and the petitioner *might* know more than he had divulged would seem to be entirely appropriate at this stage of the inquiry. Add to this the facts that the police had the permission of the petitioner's foster mother to question him, that he was not held incommunicado, that he was not cut off from access to parents, friends or attorney, that he was not abused physically or mentally,

that he was not subjected to what has been termed a "massive interrogation" aimed at securing a confession of guilt of a known crime, and we have a "totality of circumstances" vastly different from those existing in those cases cited above in which confessions were deemed coerced.

Turning directly to the alleged inducement or promise proffered by the officer, again we deem the surrounding circumstances important. The officer's remark was made in response to a question asked by the petitioner who up to that moment had been accused of no crime. *At that moment neither the petitioner nor the officer knew that Doris was dead.* It is important to note that the petitioner in his subsequent confessions never deviated from his story that she was alive and breathing when he left her in the woods, that he thought she was only "knocked out" and that his purpose in dragging her to the point where she was found was to delay her finding her way out of the woods after she regained consciousness and thereby to afford himself more time to escape. The officer, interestingly enough, was speculating about the possible consequences to Michaud of events, the existence and nature of which he could only conjecture. More important, however, is the fact that the officer *made no promise nor did he offer any assurances.* We are not concerned here with the effect of any erroneous interpretation which the petitioner may have given to the officer's remark. We are concerned with the reasonable and intended meaning of what was said and the circumstances under which the words were spoken. No offer was made in return for an admission or a confession. The officer merely answered a question. His answer made it clear even to a person of somewhat limited intelligence that he did not know what might happen to Michaud and only the courts could determine. He did not even suggest that he or anyone else would intervene on petitioner's behalf. *And we reiterate that the officer did not then know what the petitioner had done.* If the petitioner then suddenly

and voluntarily decided to show the officers where he had left Doris, he did so for reasons of his own and not because of any coercive treatment or improper inducement on the part of the police. We say in summary that in our view the police did not under all the circumstances here present exceed the bounds of permissible police investigation of an unexplained disappearance. We find no vestige of constitutional deprivation.

The petitioner relies primarily on *Haley, Gallegos* and *Escobedo, supra*. The "totality of circumstances" in each of these cases, however, was very different from that presented in the instant case. In Haley the police were investigating a murder committed during the course of a robbery. The issue was the voluntariness of Haley's signed confession admitted in evidence at his trial. Haley was a Negro boy 15 years of age. He was questioned by the police working in relays for about five hours. In effect the police were primarily seeking confirmation by confession of what they already knew, for in the course of the interrogation the police showed Haley the confessions of his two accomplices. Immediately after this event Haley confessed. As Mr. Justice Frankfurter said in his concurring opinion (page 307 of 68 S. Ct.) : "Of course, the police meant to exercise pressures upon Haley to make him talk. That was the very purpose of their procedure." The court noted that Haley was held incommunicado for three days, that a lawyer retained by his mother was twice refused admission by the police and the mother herself was not allowed to see him for five days. He was not taken before a magistrate for three days after the signing of the confession. This conduct, although for the most part occurring after the confession was made, was viewed by a divided court as evidence of "such a callous attitude of the police towards the safeguards which respect for ordinary standards of human relationships compels," that the court took "with a grain of salt their present apologia that the five hour gril-

ling of this boy was conducted in a fair and dispassionate manner." In the instant case there are no intimations even from the petitioner himself that the police acted in any such manner.

In *Gallegos,* involving the formal confession of a 14 year old boy, the accused was held incommunicado for six days. His mother was not permitted to see him and "he was cut off from contact with any lawyer or adult advisor." Here again the police were dealing with a known crime, assault and robbery ultimately culminating in murder when the victim died. The participation of the accused in the assault and robbery was admitted orally by him immediately upon his apprehension but the formal confession held involuntary by the court was signed only at the end of his "long detention." A divided court, listing the operative factors, determined that "all these combine to make us conclude that the formal confession on which this conviction may have rested was obtained in violation of due process." We view the combination of circumstances in *Gallegos* as readily distinguishable from those obtaining here.

In *Escobedo* the case turned on the deprivation of the right to counsel as guaranteed by the sixth amendment and made obligatory upon the states by the fourteenth. The accused had an attorney who obtained his release from custody by writ of habeas corpus on the first occasion of attempted interrogation. After the police had obtained information from the accomplice implicating the accused in the murder under investigation, Escobedo was again arrested. His retained attorney arrived shortly after the accused reached police headquarters but was denied access to his client. He persisted for several hours in his efforts to see the accused but to no avail. During a long interrogation Escobedo was kept handcuffed and in a standing position. As Mr. Justice Goldberg stated at page 1762 of 84 S. Ct.: "When petitioner requested, and was denied, an

opportunity to consult with his lawyer, the investigation had ceased to be a *general investigation of 'an unsolved crime.'* * * * Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so." (Emphasis supplied.) A divided court deemed this to be a "critical stage" when the assistance of counsel was required. "Petitioner had, for all practical purposes, already been charged with murder." These facts bear no relation to those in the instant case.

As already noted the petitioner did not at any time before leading the officers to the place in the woods where the body of the child was discovered request the presence of counsel. We are aware that some courts are of the view that *Escobedo* does not require the exclusion of a confession otherwise voluntary in a case in which counsel has not been requested by the accused or effectively denied by the police even though the accused was not warned of his right to counsel or his right to remain silent. *People* v. *Hartgraves* (1964), 31 Ill. (2nd) 375, 202 N.E. (2nd) 33; *People* v. *Lewis* (1965), 32 Ill. (2nd) 391, 207 N.E. (2nd) 65; *People* v. *Richardson* (1965), 32 Ill. (2nd) 472, 207 N.E. (2nd) 478; *Commonwealth* v. *Ladetto* (1965), 207 N.E. (2nd) (Mass.) 536, 541; (but cf. *Commonwealth* v. *McCarthy* (1964), 200 N.E. (2nd) (Mass.) 264; *Hinkley* v. *State* (1965), 389 S.W. (2nd) (Tex.) 667; *Cowans* v. *State* (1965), 238 Md. 433, 209 A. (2nd) 552; *Jenkins* v. *State* (1965), 238 Md. 451, 209 A. (2nd) 616; *Bull* v. *State* (1965), 239 Md. 101, 210 A. (2nd) 396; *Bean* v. *State* (1965), 398 P. (2nd) (Nev.) 251; *Commonwealth* v. *Patrick* (1965), 416 Pa. 437, 206 A. (2nd) 295; *Commonwealth* v. *Coyle* (1964), 415 Pa. 379, 203 A. (2nd) 782, 794; *People* v. *Gunner* (1965), 15 N.Y. (2nd) 226, 205 N.E. (2nd) 852; *Browne* v. *State* (1964), 24 Wis. (2nd) 491, 131 N.W. (2nd) 169; *State* v. *Fox* (1964), 131 N.W. (2nd) (Iowa) 684. We would nevertheless hesitate to

assume that *Escobedo* might not be applied in an appropriate case even though there had been no request for or denial of counsel once the case had reached an accusatory stage. In a case in which a respondent was entitled to the assistance of counsel at the trial stage the Supreme Court of the United States held that such right was not lost by failure to request the aid of counsel. *Carnley* v. *Cochran* (1962), 369 U.S. 506, 613, 82 S. Ct. 884, 889. To the same effect *U. S.* v. *LaVallee* (1964), 2nd Cir., 330 F. (2nd) 303. The California court determined that confessions taken at the accusatory stage must be barred from evidence unless the accused intelligently waived his right to counsel and to remain silent. The court declined to make the right dependent upon a request for counsel by the accused. *People* v. *Dorado* (1965), 42 Cal. Rptr. 169, 398 P. (2nd) 361. Reaching the same result *State* v. *Dufour* (1965), 206 A. (2nd) (R.I.) 82; *State* v. *Neely* (1964), 395 P. (2nd) (Ore.) 557; *People* v. *Davis* (1965), 44 Cal. Rptr. 454, 402 P. (2nd) 142; *State* v. *Mendes* (1965), 210 A. (2nd) (R.I.) 50, 54; *United States ex rel. Russo* v. *New Jersey* (May 20, 1965), 3rd Cir., 351 F. (2nd) 429.

We neither intimate nor suggest what our holding would be in a case in which decision turned on the absence of any request for the aid of counsel and denial of the same. It is apparent that a resolution of the divergent views expressed in the opinion above cited must await a further opinion of the Supreme Court of the United States. It suffices to say that all the cases which have come to our attention are in accord that failure to warn of the right to counsel and to remain silent has no adverse effect on the admissibility of admissions and confessions elicited from one during the purely *investigatory* stage. We have discussed this issue only because it is apparent that the justice below based his decision in part upon the concept that this petitioner suffered a constitutional deprivation when the police failed to give him such warnings at the stage when they were

merely investigating an unexplained disappearance without any knowledge that a crime had been committed. Even under the so-called liberal rule announced by *Dorado* the right to be warned had not accrued at this stage.

Even if *Escobedo* were otherwise applicable in the instant case we would not be disposed to give it retrospective application in the absence of an unequivocal holding by the Supreme Court of the United States that such a result is required. We are dealing here with post conviction relief which is sought many years after the conviction of the petitioner became final. In a recent case the California court declined to apply *Escobedo* retroactively on a collateral attack at the post conviction stage. The court said in part that "new interpretations of constitutional rights have been, and should be, applied retroactively only in those situations in which such new rules protect the innocent defendant against the possibility of conviction of a crime he did not commit; * * * an absolute rule of retroactivity as to interpretations of constitutional rights which envisage the correction of future practices would impair the administration of criminal law and ultimately result in constitutional rigidity. * * * Thus the rule contemplated the prospective prevention of coercive practices — not the extirpation of such practices committed in the past. * * * We cannot say that the possibility of abuse in the past is such that the *voluntary* statement then elicited must now be exorcised." *In Re Lopez* (1965), 42 Cal. Rptr. 188, 398 P. (2nd) 380, 383.

The New Jersey court held in a post conviction relief case that the issue of voluntariness of a confession had been finally adjudicated and was no longer open; that insofar as *Escobedo* might be deemed to invalidate prior convictions (apart from voluntariness) the rule therein announced should not be given retrospective application. The court was of opinion that society reasonably expects that when

a man has been convicted of a crime by a method not considered unfair according to the rules of law then in effect, such a conviction will stand. The court noted that at the time *Escobedo* was decided, almost all of the states permitted the introduction of voluntary confessions given in the absence of counsel during police investigation. Retroactive application would therefore have far reaching consequences. The purpose of *Escobedo* was to change the conduct of police in the future, a purpose which is in nowise furthered by retrospective application. *State* v. *Johnson* (1965) 43 N.J. 572, 206 A. (2nd) 737.

We think the reasons given by the Supreme Court of the United States for not giving retrospective application to its newly announced rule in *Mapp* v. *Ohio* (1961), 367 U.S. 643, 81 S. Ct. 1684 relate with equal force to the retroactivity of *Escobedo*. In *Linkletter* v. *Walker* (1965), .... U. S. ——, 85 S. Ct. 1731, the court held that *Mapp* should not be applied retrospectively to state court convictions which had become final before the rendition of the opinion in the latter case. The court acted upon the premise that it was "neither required to, nor prohibited from applying a decision retrospectively" and must "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." The court was of opinion that the prime purpose of *Mapp* was the effective deterrence of lawless police action and this purpose would not be advanced by making the rule retrospective. "The misconduct of the police prior to *Mapp* has already occurred and will not be corrected by releasing the prisoners involved." The court was also concerned for the administration of justice if the rule were applied retrospectively to old cases in which evidence has been long since destroyed, misplaced or deteriorated and witnesses are no longer available or their memory is dimmed. The court distinguished situations involving "the

fairness of the trial — the very integrity of the fact finding process." In two very recent cases the courts declined to apply *Escobedo* retrospectively. *United States ex rel. Walden* v. *Pate* (July 27, 1965), 7th Cir., .... F. (2nd) ....; *Commonwealth* v. *Negri* (Sept. 29, 1965), .... Pa. ...., .... A. (2nd) .....

We conclude as to Count V that the admissions of the petitioner leading up to and including the act of directing the officers to the scene of the crime were not the product of any improper inducement or coercion; that the petitioner suffered no constitutional deprivation with respect to his right to counsel and to remain silent; and that no evidence adduced in support of this count warrants post conviction relief or requires a new trial.

As to Count IX charging incompetence of counsel, we have reviewed the entire trial record and can find no evidence to support or justify such a finding. As noted above, the justice below made no determination of this issue. Given the premise that no promise was ever made to the petitioner or communicated to his counsel, we are left with a case in which the defense attorney was faced with overwhelming and conclusive evidence of guilt. He could not demonstrate that the confessions of his client were inadmissible nor could he prove the petitioner's insanity. The quality of his representation was certainly not such as to constitute a constitutional deprivation.

The entry will be

*Appeal sustained.*

*Judgment for the State.*

*Petitioner remanded in execution of his sentence.*